# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL D. JACKSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:14 CV 69 DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Michael D. Jackson for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, 1381. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.

## **I. BACKGROUND**

Plaintiff was born on March 30, 1982. (Tr. 36.) He filed his applications on October 15, 2008, alleging an October 10, 2008 onset date, and claiming disability due to depression, mental problems, type II diabetes, and back pain. (Tr. 226-29, 270.) Plaintiff's applications were denied initially, and he requested a hearing before an ALJ. (Tr. 120-26.)

On June 8, 2010, following a hearing, the ALJ issued a decision finding plaintiff was not disabled as defined under the Act. (Tr. 104-15.) On July 6, 2011, the Appeals Council granted his request for review and remanded for the ALJ to evaluate the severity

of his back impairment; obtain additional evidence concerning his back impairment, specifically to expand the record to include treatment information relating to plaintiff's back impairment following an August 25, 2010 MRI; and obtain evidence from a vocational expert if warranted. (Tr. 16-18.) On May 18, 2012, following a second hearing, an ALJ again concluded that plaintiff was not disabled under the Act. (Tr. 15-25.)

On April 5, 2014, the Appeals Council denied plaintiff's request for review. (Tr. 1-6.) Thus, the ALJ's decision stands as the final decision of the Commissioner subject to judicial review.

## II. MEDICAL AND OTHER HISTORY

Plaintiff was seen in the emergency room of the Poplar Bluff Regional Medical Center on January 16, 2008, complaining of being "stressed out." He appeared mildly anxious, and the clinical impression was acute anxiety. (Tr. 396-98.)

Plaintiff was seen in the emergency room of the Poplar Bluff Regional Medical Center on February 7, 2008, following a motor vehicle accident. The clinical impression was a contusion of his left elbow and a concussion with loss of consciousness. (Tr. 403-08.)

On March 7, 2008, plaintiff was seen in the emergency room of the Poplar Bluff Regional Medical Center for acute bronchitis and an upper respiratory infection. He was prescribed an antibiotic, as well as Lortab, a combination of hydrocodone, an opioid pain medication and acetaminophen. (Tr. 412.)

Plaintiff saw Navid Siddiqui, M.D., his primary care physician, at the Kneibert Clinic on April 11, 2008, for low back pain that was not improving. He had run out of medication. Dr. Siddiqui prescribed Norco, containing hydrocodone and acetaminophen. (Tr. 464-65.)

Plaintiff was seen in the emergency room of the Poplar Bluff Regional Medical Center on May 6, 2008, for chest pain after lifting weights and for low back pain since his

motor vehicle accident.  He was diagnosed with chest strain and low back pain.  He was prescribed Vicodin and discharged.  (Tr. 419-21.)

Plaintiff saw Dr. Siddiqui on May 12, 2008, for chronic lumbosacral and shoulder pain.  He was prescribed Norco and aspirin and instructed to follow up in one month.  (Tr. 462.)

On June 4, 2008, plaintiff saw Talia Haiderzad, M.D., a psychiatrist, as a new patient to establish care.  He had last seen a psychiatrist in December 2007 and wanted to get reestablished on medication.  He had run out of Geodon, a psychotropic medication used to treat schizophrenia and the manic symptoms of bipolar disorder, three to four months earlier.  He had been prescribed Geodon because he was hearing voices and seeing things.  He also reported anger problems.  Dr. Haiderzad's possible diagnoses were (1) psychosis not otherwise specified; and (2) factitious disorder, i.e., a disorder in which the person acts as if they have a disorder or illness by deliberately feigning or exaggerating symptoms, as opposed to malingering based upon the fact that he had applied for disability.  Dr. Haiderzad also wanted to rule out borderline intellect.  (Tr. 472.)

Plaintiff saw Dr. Siddiqui on June 23, 2008 for monitoring of his chronic conditions.   All of his conditions were currently being controlled with medications that included Norco; Zantac, for heartburn; Lipitor, for high cholesterol; Metformin, for type II diabetes; and Lisinopril, for hypertension.  (Tr. 453.)  A nurse's note dated June 30, 2008 indicated plaintiff had not been filling his Flexeril prescription since February.  (Tr. 444.) Plaintiff saw Dr. Siddiqui on July 22, 2008 for his back pain.  An x-ray of his lumbar spine was normal.  (Tr. 422, 446-47.)

Plaintiff saw Dr. Haiderzad on July 30, 2008.  He reported not sleeping well and poor appetite.  He reported being compliant with medications.  However, he had lost his Medicaid and was therefore issued some medication samples.  He reported that his medications made him sleepy.  Dr. Haiderzad's diagnoses were psychosis and intermittent explosive disorder.  She wanted to rule out borderline intellect.  She assigned a GAF score

of 50, indicating serious symptoms. Dr. Haiderzad discontinued the Geodon and started Abilify, for psychosis, and Trazodone, for anxiety and depression. (Tr. 471.)

On August 22, 2008, plaintiff saw Dr. Siddiqui for low back pain and recent numbness in his legs. A nerve study was conducted and was within normal limits. (Tr. 433, 441-42.) Plaintiff saw Dr. Sinniqui for monitoring of his diabetes and back pain in September and October 2008. Dr. Sinniqui adjusted his medications. (Tr. 424, 430-32.) Plaintiff saw D.K. Varma, M.D., on October 7, 2008 for back pain, shortness of breath, abdominal pain, and nervousness. (Tr. 423.)

Plaintiff saw Dr. Haiderzad on July 12, 2008. He was not sleeping or eating well. He was sleepy during the day and up at night. Dr. Haiderzad's impression and GAF score remained the same. (Tr. 470.)

In November 19, 2008 correspondence Dr. Haiderzad stated:

> I am writing this note at the request of client. Client has been under my care since June 4, 2008. He feels he is unable to work. Indeed he may not. He takes psychotropic medications for possible psychosis. He has anger issues. He's hearing voices and seeing things, he says. Please feel free to contact us if we can be of any further assistance.

(Tr. 473.)

X-rays of plaintiff's lumbosacral spine taken December 18, 2008 were within normal limits. (Tr. 422.)

Plaintiff saw Dr. Siddiqui on four occasions between January and September 2009 for uncontrolled diabetes. He was not compliant with his medications and Dr. Siddiqui advised him of the risks of noncompliance. (Tr. 492-93, 502-03, 507, 514-16.)

Plaintiff underwent a psychiatric evaluation under Dr. Haiderzad on September 29, 2009 at his own request. Plaintiff reported hearing voices and seeing things, nervousness and headaches, and feeling depressed. He was having mood swings and anger problems. His speech was slow, but clear, coherent, and goal directed. He reported seeing lights and shadows. He also admitted to paranoid ideations. He struggled before he was able to

mention the current month using his fingers.  Dr. Haiderzad diagnosed psychotic disorder, not otherwise specified.  She wanted to rule out major depressive disorder with psychotic features, schizophrenia, and borderline intellect.  She assigned a GAF score of 50, and prescribed Invega, for schizophrenia, to replace the Geodon which made him sleepy.  She also prescribed Trazodone, a sleep aid, and Klonopin, for anxiety.  (Tr. 488-90.)

Plaintiff saw Dr. Siddiqui on October 5, 2009.  His diabetes and back pain were controlled.  He saw Dr. Siddiqui on two occasions in November 2009 for sexual dysfunction and exposure to chlamydia.  (Tr. 533-40.)

Plaintiff saw Dr. Haiderzad on November 23, 2009 and reported doing "alright." His medication was helping him sleep, and he denied any side effects except for fatigue. Plaintiff asked Dr. Haiderzad to increase his Klonopin because he was nervous and shaking a lot.  His Klonopin was increased and he was continued on Invega.  (Tr. 568.)

Plaintiff saw Dr. Siddiqui on three occasions for monitoring during December 2009 and January 2010.  (Tr. 541-45.)  Plaintiff was seen on January 2 and 5, 2010, for left shoulder pain following an injury while lifting weights.  An x-ray was negative.  (Tr. 547-50.)

Plaintiff saw Dr. Haiderzad on February 1, 2010, and reported "doing fine" and "doing good."  He had been trying to exercise.  He did not sleep much.  He had been seeing things and hearing voices again.  He had been compliant with medications but had run out a week ago and did not call for a refill because his appointment was approaching. Dr. Haiderzad assigned a GAF score of 50.  She increased his Invega and Trazadone.  (Tr. 569.)

Plaintiff saw Dr. Siddiqui on February 10, 2010 for chronic left shoulder pain.  An MRI showed mild tendinosis or degeneration due to chronic overuse and minimal degenerative changes of the acromioclavicular joint.  (Tr. 565-66.)

Plaintiff saw Dr. Siddiqui on a monthly basis from February to April 2010.  Dr. Siddiqui noted "patient's last 2 urine drug screens are negative for prescribed hydros.  I will not be giving him pain pills any more."  (Tr. 586-92.)

Plaintiff saw Dr. Haiderzad on May 3, 2010. He stated he was "doing all right" and compliant with his medications but one side effect was that he felt weak. He had few friends. Dr. Haiderzad assessed a GAF score of 50. (Tr. 576.)

Plaintiff saw optometrist Kayla Melton on May 27, 2010 for a diabetic eye exam which was normal. (Tr. 595-600.)

Plaintiff was seen at the Kneibert Clinic for monitoring in June and July 2010. On one occasion his diabetes was noted to be uncontrolled. (Tr. 604-13.)

Plaintiff saw Dr. Haiderzad on July 27, 2010. He reported hearing noncommand type voices again which were annoying to him. Plaintiff complained his medications were making him feel tired and he was spending a lot of time in his room as a result. His mood was tired. Dr. Haiderzad increased his Invega and continued his other medications. (Tr. 577.)

Plaintiff saw Wendel Elliot, M.D., at the Kneibert Clinic on August 20, 2010 for his low back pain. Tramadol was not helping. (Tr. 616.) An August 25, 2010 MRI of his lumbar spine showed (1) developmentally narrow central spinal canal; (2) moderate central spinal canal stenosis or narrowing; (3) left paracentral disc protrusion; (4) multi-level foraminal stenosis; and (5) multi-level facet hypertrophy. (Tr. 579.)

Plaintiff saw Dr. Elliot for diabetes monitoring on October 18, 2010. Physical exam showed a "thin, muscular, healthy young man." He reported that if he goes running his glucose level gets too low. He was advised to do regular but lighter exercise. He had back and left shoulder pain. Plaintiff stated that he would not be interested in surgery for his back if it was offered. (Tr. 620-21.)

Plaintiff saw Dr. Elliot on January 11, 2011 for diabetes monitoring. (Tr. 627-31.) A March 2, 2011 x-ray of his left shoulder was negative. (Tr. 581-82.) An April 7, 2011 MRI of his cervical spine showed mild degenerative changes in the lower cervical spine. (Tr. 583.) An MRI of his left shoulder showed mild rotator cuff tendinosis and mild degenerative changes of the acromioclavicular joint. (Tr. 585.) Plaintiff continued to be

seen at the Kneibert Clinic during July and September 2011 for ongoing back and shoulder pain. (Tr. 636-44.)

Dr. Elliott referred plaintiff to Nurse Practitioner Debra Price and Naveed Mirza, M.D., a psychiatrist, on September 7, 2011, for panic and anxiety. He had run out of medication, including his Klonopin, over two weeks earlier. He reported mood swings. He was diagnosed with generalized anxiety disorder, major depressive disorder, and intermittent explosive disorder. Dr. Mirza wanted to rule out bipolar affective disorder. He was started on Invega; Vistaril, for anxiety; Risperdal, for schizophrenia; and Celexa, an antidepressant. Dr. Mirza assigned a GAF score of 55, indicating "moderate" symptoms. He was scheduled for follow up in two weeks. (Tr. 647-54.)

Plaintiff saw Dr. Mirza on September 21, 2011 to establish care after his previous psychiatrist had moved. He stated that he was hearing voices, was nervous a lot, and tended to shake and sweat. He had paranoia and low frustration tolerance. He had difficulty in social situations most of the time. He was started on Paxil, an antidepressant, and his Celexa was discontinued. (Tr. 655-58.)

Plaintiff saw Shaun Ross, M.D., on October 19, 2011 during an acute diabetes visit. Plaintiff's compliance was poor and his blood sugars were elevated. He weighed 252 pounds and his BMI was 30.79. The plan was to continue current management and try harder to manage his diabetes. (Tr. 665-70.)

Plaintiff saw Nurse Price on October 31, 2011 for medication management. He was mildly depressed, had moderate panic attacks, and wanted to get back on his psychiatric medications. He was started on Ambien, a sleep aid, and his other medications were continued. (Tr. 672-74.)

Plaintiff saw Nurse Price again on November 28, 2011 for medication management. He was taking Ambien and Invega but had stopped taking Vistaril and Paxil because he did not think they were helping and made him feel sedated. He reported hearing noncommand voices at times and knew not to act on them. (Tr. 682.)

Plaintiff ran out of Invega on December 19, 2011, and his prescription was refilled. (Tr. 692.) He saw Nurse Price on January 9, 2012. He had spent Christmas alone but "was ok with that." (Tr. 685.) He was having increased depression and anxiety at times. He had run out of medication and had been out "for a while." (Id.) He needed Ambien to sleep. He was started on Wellbutrin, an antidepressant. (Tr. 685-87, 693.)

Plaintiff saw Nurse Price on March 7, 2012 and was doing about the same. His blood sugars were running low in the morning. He continued to hear voices off and on and was seeing things. He reported that his hallucinations were "no worse and seemed to be as good as they get." His psychiatric medications were continued. (Tr. 699-701.)

On April 4, 2012, plaintiff saw Dr. Elliott for a follow up for his back pain. He had a skin rash and paresthesia, a tingling or prickling to his right leg and foot. He was prescribed Gabapentin for the paresthesia. (Tr. 706-08.)

**ALJ Hearing**

The ALJ conducted a hearing on April 17, 2012. (Tr. 32-72.) Plaintiff, represented by counsel, appeared and testified to the following. He was 29 years old and lived with his mother and 11 year-old son. He graduated from high school and completed welding school thereafter. He is claiming disability due to depression, anxiety, diabetes, migraines, and back problems. While his blood sugars are erratic, he has not been hospitalized for any reactions. He cannot recall the names of medications he is taking. He has headaches every other day that last about one half hour. (Tr. 35- 40.)

He spends his days watching TV and playing video games. He does not do any household chores or yard work and mostly stays in his room. (Tr. 41-42.)

He did temporary work cleaning offices in 2004 and 2005. He has not sought work because he does not go out. He has no difficulty attending to his personal needs. He takes hydrocodone for his back pain. He has tried shots for his back pain but walked out because the needle was too long. He cannot afford physical therapy and does not perform

home exercises. He is supposed to follow a diabetic diet but does not do so and eats what his mother cooks for him. (Tr. 42-45.)

He has criminal convictions for second degree assault and auto theft. He has five children, ages nine weeks to eleven years old, who come to visit twice a month. His back hurts when he stands for long periods of time. He can stand for about thirty minutes before he needs to sit. When his back "goes out," he can barely move and he treats it with cream and a heating pad for several hours. He is afraid of undergoing back surgery. (Tr. 42-48, 53.)

About three times per week he hears voices he does not recognize and that talk to each other. The voices interfere with his ability to concentrate and he gets shaky and frightened. He considers himself paranoid. He does not like being around people and gets shaky and wants to fight when he is around others. (Tr. 48-51.) He did not have much work to do when he worked cleaning offices. He has trouble falling asleep and making and keeping friends. He has difficulty remembering what he has read. He does not know how to cook. His mother does all of the grocery shopping. He has a driver's license but does not drive much due to his paranoia. He is not good at reading or math. He plays video games for three to four hours at a time. (Tr. 50-56.)

He stopped working cleaning offices because his employer hired someone else. However, he was never advised that he was not doing his job properly. He worked for Nordyne stacking boxes but quit because people were "messing" with him by talking about him. He did temporary work for Manpower but was never called back. He left work at Tyson Chicken because he went to jail. He loaded furniture for Rowe Industries and left again because he went to jail. He has performed assembly line work but was fired following an altercation with another employee. (Tr. 66-68.)

Medical Expert Durado Brooks, M.D., an internist, also appeared and testified to the following. Plaintiff's medical impairments include chronic low back pain, moderate degenerative disc disease, chronic left shoulder pain with evidence of tendonosis and mild degenerative joint disease. He has mild degenerative disease involving the cervical spine.

He is diabetic and hypertensive. Dr. Brooks opined that plaintiff did not meet or equal a listing since October 2008. Plaintiff has the RFC to lift and carry up to twenty pounds occasionally and ten pounds frequently; sit for six hours and stand and/or walk for six hours in an eight-hour workday; occasionally push/pull and reach overhead with the left arm; and only occasionally balance, stoop, kneel, crouch, and crawl. He must never climb ladders, ropes, or scaffolds, and must have only limited exposure to vibration. (Tr. 57-59.)

Medical Expert Karyn Perry, a clinical psychologist, also appeared and testified to the following. Plaintiff has been treated for psychosis disorder not otherwise specified since 2008. A major depressive disorder was ruled out and more information was needed in order to make a definitive diagnosis. Because plaintiff had a previous diagnosis of malingering, and there was a current question of a factitious disorder, Dr. Perry believed that plaintiff did not meet or equal a listing. She opined that plaintiff had mild limitation in activities of daily living, moderate limitation in social functioning and concentration, persistence or pace, and no episodes of extended decompensation. She believed that plaintiff could perform simple and/or repetitive work that did not require close interaction with the public or coworkers. She did not think that plaintiff's current living situation wherein his mother took care of all of his needs was the healthiest environment. (Tr. 59-65.)

John Grenfell, a vocational expert (VE), also testified at the hearing. Plaintiff has past relevant work that is light and medium. The VE was asked to assume a hypothetical individual with the same age, education and work experience as plaintiff who was limited to lifting twenty pounds occasionally and ten pounds frequently. The individual could stand/walk for two hours in an eight-hour workday. He could sit for six hours in an eight-hour workday. He could occasionally push/pull using the left upper extremity. He was prohibited from climbing ladders, ropes, or scaffolds. Balancing, stooping, kneeling, crawling, and crouching was limited to occasionally. Overhead reaching with the left upper extremity was limited to occasionally. He must avoid whole-body vibration

exposure. He was limited to simple/repetitive work that did not require close interaction with the public or coworkers. The VE testified that plaintiff could not perform his past relevant work under that hypothetical, however, there were other jobs at the sedentary level he could perform such as surveillance system monitor, order clerk, and addresser. The hypothetical individual would be terminated if were to miss more than two days of work per month. (Tr. 65, 68-70.)

**Decision of the ALJ**

On May 18, 2012, the ALJ found that plaintiff was not disabled as defined under the Act. (Tr. 15-25.) The ALJ found that plaintiff had the severe impairments of degenerative disc disease of the lumbar and cervical spine, mild degenerative joint disease of the left shoulder, depression, generalized anxiety disorder, and a psychotic disorder not otherwise specified. (Tr. 17.) The ALJ found that he did not have an impairment or combination of impairments listed in or medically equal to one contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18.)

The ALJ determined that plaintiff retained the residual functional capacity (RFC) to lift and carry up to twenty pounds occasionally and ten pounds frequently; sit for six hours and stand and/or walk for six hours during an eight-hour workday; occasionally push/pull and reach overhead with the left arm; and only occasionally balance, stoop, kneel, crouch, and crawl. Plaintiff was limited to simple and routine tasks that required only occasional interaction with the public and coworkers. (Tr. 20.)

The ALJ rejected plaintiff's assertion that that he was limited to jobs of only Reasoning Level 1, noting that testing at age thirteen was not representative of an individual's permanent level of functioning, and in this case was contradicted by the fact that plaintiff graduated from high school. He also noted there was no record evidence of ongoing cognitive deficits to support a finding plaintiff was limited to Reasoning Level 1 jobs. He denied plaintiff's request for additional development on that issue because no treating or examining source suggested plaintiff had cognitive deficits. He noted that Dr.

Perry testified that plaintiff had only "moderate" limitation in maintaining concentration, persistence, or pace, and that such a limitation is not consistent with the ability to perform Reasoning Level 1 jobs only. Finally, the ALJ noted that plaintiff's earnings and work history indicate that as a janitor in 2005 he achieved earnings consistent with substantial gainful activity, a Reasoning Level 3 job. (Tr. 23.)

The ALJ found that plaintiff's impairments would not preclude him from performing work that exists in significant numbers in the national economy, including work as a surveillance system monitor, order clerk, and addresser. (Tr. 24.) Consequently, the ALJ found that plaintiff was not disabled. (Tr. 25.)

## IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen

v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues that the ALJ erred in failing to include additional limitations in his hypothetical question to account for his reading, writing, and general intellectual limitations. This court disagrees.

Plaintiff's argument that the hypothetical question did not capture the extent of his limitations implicitly puts the ALJ's credibility analysis into question. An ALJ's hypothetical question need only account for those functional limitations that the ALJ finds are credible and well supported by the record. See Smith v. Colvin, 756 F.3d 621, 627 (8th Cir. 2014). Discredited subjective complaints are properly excluded from a hypothetical question so long as the ALJ had reason to discredit them. See Guilliams v. Barnhart, 393 F.3d 798, 804 (8th Cir. 2005).

In this case, most of the functional limitations plaintiff alleges would render him disabled are essentially subjective, including his reports of pain and his mental

- 13 -

impairments.  The ALJ in this case properly determined that plaintiff's subjective complaints were not credible.  Therefore, his hypothetical question properly accounted for only those functional limitations that were credible based on the record as a whole.

Specifically, the ALJ first noted plaintiff's questionable work history.  Plaintiff had a history of low earnings with only two years of earnings at the substantial gainful activity level.  (Tr. 22, 256.)  See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001) (lack of work history may indicate a lack of motivation to work rather than a lack of ability). The ALJ also noted that plaintiff's alleged onset date, October 10, 2008, did not correspond with any medical event.  (Tr. 22.)  Instead, plaintiff indicated that he stopped working at his most recent job because his employer went out of business.  (Tr. 270.) Plaintiff also lost three other jobs after serving time in jail.  (Tr. 67.)  The fact that a claimant left a job for reasons other than his medical condition is a proper consideration in assessing credibility.  See Medhaug v. Astrue, 578 F.3d 805, 816-17 (8th Cir. 2009) (relevant that claimant did not leave his position because of any back injury but because he was laid off due to a decline in work; claimant's alleged onset date was the same as date he was laid off).  The ALJ also noted that plaintiff's reports about his daily activities weighed against his credibility.  While plaintiff testified that he had trouble concentrating, he also indicated that he played video games three to four hours a day.  (Tr. 56.)  Plaintiff also testified that he was anxious being around people and mostly kept to himself. However, plaintiff had had a number of girlfriends and had fathered five children.  (Tr. 46, 48, 54, 80.)  Despite his alleged physical impairments, including back pain, the record evidence showed plaintiff's activities included weightlifting as recently as 2010. (Tr. 420, 547, 550.)  See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (activities that are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility).

The ALJ further observed that despite his reports of severe back pain, plaintiff had undergone only conservative treatment, and there was no record evidence that he was in pain management or physical therapy.  Nor was plaintiff ever referred for surgery.  (Tr.

22.) See Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001) (pattern of conservative medical treatment is a proper factor for an ALJ to consider in evaluating a claimant's credibility).

The ALJ also noted that none of plaintiff's doctors ever indicated that he had any long-term exertional or non-exertional limitations or concluded that that he was disabled and unable to perform any type of work. (Tr. 23.) Cf. Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (lack of significant restrictions imposed by treating physicians supported the ALJ's decision of no disability). Finally, the ALJ noted that plaintiff was noncompliant with treatment on several occasions. (Tr. 18, 23, 502, 507, 594, 647, 665.) See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001) (noncompliance with treatment is a proper factor in the credibility analysis). Based on all of these factors, the ALJ properly determined that plaintiff's subjective complaints were not entirely credible. See Gragg v. Astrue, 615 F.3d 932, 940 (8th Cir. 2010) (hypothetical question posed by the ALJ incorporated the physical, mental, and cognitive impairments that the ALJ found to be credible, and excluded those impairments that were discredited or that were not supported by the evidence presented).

Plaintiff's sole argument on appeal is that the ALJ erred in failing to include additional limitations in his hypothetical question to account for his reading, writing, and general intellectual limitations. In support, he cites school records from 1989 to 1995 when he was seven to thirteen years old. However, the relevant period in this case is from October 10, 2008 through May 18, 2012. Accordingly, the issue is plaintiff's level of functional impairment during that period, not when he was a child. Plaintiff assumes incorrectly that his level of functioning as reported in 1995 accurately reflects his current ability. As the ALJ noted, Social Security regulations recognize that results of testing can vary substantially over the course of childhood. Thus, these scores are not considered reliable for an extended period of time after testing. (Tr. 23.) See 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 112.00(D)(10). As the ALJ noted, there is no record evidence that plaintiff's early academic performance is representative of his status during the relevant

period here, as he seems to suggest. (Tr. 23). On the contrary, the ALJ noted that plaintiff graduated from high school and subsequently completed vocational training for welding. (Tr. 23, 36, 276.)

Plaintiff also claims that he has difficulty reading and following written directions and needs others to assist him with reading. However, this is contradicted by his own application for benefits wherein he indicated that he could read and understand English. (Tr. 269.) He also cites Dr. Haiderzad's "rule out" diagnoses of borderline intellectual functioning. (Tr. 471-72, 489.) While Dr. Haiderzad had considered borderline intellectual functioning, she later ruled it out. (Tr. 487, 569, 576-77.) The ALJ also noted that other record evidence from the relevant period does not suggest that plaintiff had academic or intellectual limitations beyond those already accounted for in his RFC. (Tr. 23.) Finally, plaintiff did not allege disability due to an intellectual impairment at the administrative hearing. (Tr. 37.) This court concludes that the record evidence from the relevant period does not support limitations due to intellectual impairments beyond the limitations already included by the ALJ in his RFC determination.

Plaintiff argues that his limited reading ability precludes him from performing the jobs identified by the VE. However, from record evidence from 1989 through 1995, plaintiff relies on his own testimony. As previously discussed, the ALJ properly determined that plaintiff's subjective complaints were not credible for a variety of reasons. (Tr. 22-23.)

Plaintiff also contends that the ALJ mischaracterized his past work as a janitor. He argues that it should have been characterized as a "cleaner," as defined in the Dictionary of Occupational Titles. However, plaintiff's past work as a janitor was only one reason offered by the ALJ for rejecting plaintiff's contention that he was limited to jobs with a Reasoning Level of 1. The ALJ rejected plaintiff's argument because he graduated from high school, completed vocational training as a welder, and no medical source had diagnosed any intellectual disability. (Tr. 23.) As stated earlier, Dr. Haiderzad considered borderline intellectual functioning but later ruled it out. Finally, the ALJ also properly

considered the opinion of psychological expert Dr. Perry. Dr. Perry testified that she reviewed all of plaintiff's psychiatric records and opined that none supported limitations beyond those incorporated into the ALJ's RFC determination. (Tr. 60-65.)

Plaintiff argues that remand for additional cognitive testing is justified based on Gasaway v. Apfel, 187 F.3d 840 (8th Cir. 1999). However, Gasaway is distinguishable on several grounds. First, Ms. Gasaway was not represented by counsel, and under such circumstances, an ALJ has a heightened duty to develop the record. See Miller v. Sullivan, 953 F.2d 417, 422 (8th Cir. 1992). The absence of counsel was particularly relevant there because a claimant with an intellectual disability could not reasonably be expected to fully develop her own case. Second, Ms. Gasaway provided academic records that placed her IQ scores in a range that would render her disabled under the Listings. See 187 F.3d at 843. In this case, plaintiff's IQ scores were much higher and indicated he was in the low average range of intellectual functioning. (Tr. 338.) Third, despite Ms. Gasaway's low test scores placing her in the mental retardation range, the agency's decision in Gasaway did not show that the ALJ evaluated and rejected, or even noticed, the possibility that Ms. Gasaway might be mentally impaired in some way. 187 F.3d at 843. In contrast, the ALJ here clearly considered plaintiff's asssertions of an intellectual disability and noted the results of early testing from 1995. The ALJ concluded that the record as a whole indicated that those test results were outdated and not an accurate reflection of plaintiff's current level of functioning. (Tr. 23.) For these reasons, the ALJ's decision is distinguishable from Gasaway.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

                                              S/ David D. Noce
                                    **UNITED STATES MAGISTRATE JUDGE**

Signed on August 31, 2015